# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

REPAIRIFY, INC.,

        Plaintiff,

v.

AIRPRO DIAGNOSTICS, LLC,
CHARLES OLSEN and
WILFREDO RODRIGUEZ,

        Defendants.

)
)
)
)
)
)
)
)

Case No. 3:16-cv-984-J-34JRK

---

## REPAIRIFY'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Repairify, Inc. ("Repairify") moves pursuant to Rule 65 for a preliminary injunction against all defendants enforcing the non-compete provisions in Repairify's employment agreements with defendants Charles Olsen ("Olsen") and Wilfredo Rodriguez ("Rodriguez"),[1] and says:

1.      Olsen and Rodriguez are former Repairify employees. Olsen and Rodriguez signed employment agreements with Repairify (the "Olsen Agreement" and "Rodriguez Agreement," attached to the Kelly affidavit as Exhibits A and B).

---

[1] Repairify relies on the attached affidavit of Douglas Kelly (Exhibit 1), affidavit of Kristi Lamey (Exhibit 2), the transcript of November 4, 2014 proceedings in the bankruptcy case of *AES Technologies, LLC*; Case No. 3:14-bk-05397-PMG (Exhibit 3), and the November 4, 2014 order entered by The Honorable Paul M. Glenn in AEST's bankruptcy case (Exhibit 4; and Doc. 19 in that case).

2. Paragraph 3 of both Agreements precludes Olsen and Rodriguez from competing with Repairify *in North Florida or wherever Repairify does business, for two years after their employment*:

REPAIRIFY, INC.
EMPLOYMENT AGREEMENT

In consideration of Repairify, Inc. ("Company") agreeing to employ the undersigned ("Employee"), the undersigned Employee covenants and agrees as follows:

* * *

3. <u>Covenant not to Compete</u>. The Employee covenants and agrees with the Company that while he is a Company employee or at any time two (2) years thereafter, he shall not compete with the Company in the "Restricted Territory." Competition means competition with any business being carried on by the Company at the time the Employee ceases to be an employee or the Company. "Restricted Territory" means anywhere in North Florida or where Discover Technologies conducting business.[2]

3. Olsen and Rodriguez are competing with Repairify. Earlier this year, Olsen and then Rodriguez stopped working for Repairify and went to work for defendant AirPro Diagnostics, LLC ("AirPro") (Kelly affidavit, para. 3). AirPro is headquartered in Jacksonville, Florida and competes with Repairify throughout the United States (Kelly affidavit, para. 3).

---

[2] The covenants not to compete define the "Restricted Territory" as "anywhere in North Florida or where Discover Technologies conducting business." Through a scrivener's error, "Discover Technologies" was inserted instead of the "Company" or "Repairify" (Lamey affidavit, paras. 2-4). A reading of the Agreements as a whole shows that the covenants should have defined the Restrictive Territory as "anywhere in North Florida or where the Company [is] conducting business." In any event, Discover Technologies, like Repairify, does business throughout the United States (Lamey affidavit, para. 5).

4.      For these reasons, Olsen and Rodriguez should be preliminarily enjoined from competing with Repairify pursuant to the two year terms of the non-compete provisions in their Repairify employment agreements.

5.      Rule 65 provides the *procedure* for granting a preliminary injunction in actions based on diversity jurisdiction.  *Ferrero v. Associated Materials*, 923 F.2d 1441, 1448 (11th Cir. 1991).

6.      Rule 65 requires the movant for injunction to show four elements:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.
>
> *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

7.      Section 542.335, Fla. Stat., provides the *substantive* state law courts consider when "analyzing, evaluating and enforcing restrictive covenants contained in employment contracts."  *Proudfoot Consulting v. Gordon*, 576 F.3d 1223, 1230-31 (11th Cir. 2009).

## I.      <u>Background</u>

8.      Repairify and AirPro each allege that they directly compete throughout the nation to provide diagnostic and programming scanning services to vehicle repair facilities for vehicle modules.

9. Well before AirPro was founded, Lonnie Margol, the CEO of AirPro, founded a company known as AES Technologies, LLC ("AEST") and, until the third quarter of 2014, he served as its CEO and Chairman of the Board.[3]

10. When Mr. Margol was CEO and Chairman of the Board of AEST, the primary business of AEST was the provision of diagnostic and programming scanning services for vehicle modules throughout the United States through AEST's division known as Collision Diagnostic Services ("CDS"); i.e. substantially the same type of services Repairify and AirPro provide to the market today. AEST's most valuable asset was U.S. Patent 8,688,313 dated April 1, 2014 (the "Patent"), together with the systems and methods for delivery of the services to the company's customers (see Patent's "Abstract," Exhibit F to Kelly affidavit).

11. Due to AEST's insolvency, mismanagement and contention among Board Members and the CEO (Mr. Margol), AEST filed bankruptcy on October 31, 2014 in this Division (Case No. 3:14-bk-05397-PMG) (see generally the transcript of the November 4, 2014 proceedings in that case, attached as Exhibit 3). Within days of the bankruptcy filing, certain Board Members and equity holders of AEST supported a motion to displace the dysfunctional executive management and appoint an independent Chief Restructuring Officer ("CRO") to operate the company while setting up an auction process for the sale of AEST's assets to maximize value to the company's creditors and equity holders (*Id.* and

---

[3] Transcript, page 37, lines 20-22, of November 4, 2014 proceedings in the bankruptcy case of *AES Technologies*, *LLC,* Case No. 3:14-bk-05397-PMG, attached as Exhibit 3.

the November 4, 2014 order entered by The Honorable Paul M. Glenn in AEST's bankruptcy case (Doc. 19 in that case), attached as Exhibit 4).

12.     The independent CRO was successful and auctioned the operating assets to Repairify on July 28, 2015 (Kelly affidavit, para. 7).  Repairify paid $4,750,000.00, plus additional consideration, for the operating assets, including AEST's employment agreements with its employees, including Olsen and Rodriguez, the customer base, the Patent and the related systems and methods for diagnosing and programming vehicles (Kelly affidavit, para. 7).

13.     Mr. Margol and Olsen are two of the "Inventors" for the Patent (page 1 of the Patent, Exhibit F to Kelly affidavit).  Additionally, prior to the sale of the Patent and other assets to Repairify, Olsen had served as Director of Advanced Remote Diagnostics and Technical Support, the very same position he accepted with Repairify upon the sale of the AEST/CDS assets to Repairify in 2015.  As a result, AirPro and Olsen have had complete access to not only the confidential and proprietary information leading to and underlying the Patent, but also the confidential and proprietary technical, business, customer and financial information related to the very business affairs sold at the auction to Repairify.

14.     Thus, while Repairify owns the Patent and the related non-public proprietary information and technology associated with the implementation of the technology through its scanning product, AirPro and Olsen are now improperly capitalizing on their specialized training and the Patent technology imbedded in

Repairify's AsTech Product, as well as the highly confidential technical, business, customer and financial information related to Repairify's business affairs.

15.     The discussion to follow demonstrates that Repairify has legitimate business interests to protect by enforcing the non-competition provisions in the employment agreements against all defendants and that Olsen and Rodriquez have breached these agreements at the improper behest of AirPro.

**II.     Repairify is substantially likely to succeed on the merits.**

   A.     Repairify's legitimate business interests justify the non-compete restrictions.

16.     To enforce a covenant not to compete, the employer must prove "(1) the 'existence of one or more legitimate business interests justifying the restrictive covenant' and (2) 'that the contractually specified restraint is reasonably necessary to protect' the established interests of the employer." *North American Products Corp. v. Moore*, 196 F.Supp.2d 1217, 1228 (M.D. Fla. 2002) (quoting § 542.335(1)(b) and (c), Fla. Stat.).

17.     § 542.335(1)(b) defines a "legitimate business interest" to include:

   1.  Trade secrets, as defined in s. 688.002(4).
   2.  Valuable confidential business or professional information that otherwise does not qualify as trade secrets.
   3.  Substantial relationships with specific prospective or existing customers, patients, or clients.
   4.  Customer, patient, or client goodwill associated with:
       a.  An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";

   b. A specific geographic location; or

   c. A specific marketing or trade area.

  5. Extraordinary or specialized training.

  18. As shown below, Repairify's legitimate business interests that justify the non-compete agreements include:

  a. Repairify's trade secrets and other valuable non-public confidential business information that Olsen and Rodriguez were privy to in performing their Repairify employment duties;

  b. Repairify's substantial relationships with prospective and existing customers, with whom Rodriguez (as to existing customers) and Olsen had substantial contact; and

  c. Olsen and Rodriguez' extraordinarily specialized training and knowledge about how to deliver the diagnostic and programming services for vehicle enduser repair facilities (customers) throughout the United States.

  19. As noted, on July 28, 2015, Repairify purchased the operating assets of AEST (inclusive of CDS) out of bankruptcy for $4,750,000.00, plus additional consideration (Asset Purchase Agreement and executed Bill of Sale, Exhibits C and D to the Kelly affidavit).

  20. AEST/CDS was in the business of scanning computer modules in vehicles, and selling a product known as the AsTech to enable this scanning.

  21. After the AEST/CDS acquisition, Repairify continued to (i) market, sell and service the AsTech, including an updated version called AsTech2

(collectively, the "AsTech Product"), and (ii) perform related scanning services under the name "Collision Diagnostic Services" or "CDS" (Kelly affidavit, para. 12 (the operating assets Repairify purchased included use of the CDS name)). A printout of Repairify's website is attached to the Kelly affidavit as Exhibit E. The AsTech Product enables the scanning, diagnostic, and programming services by Repairify of a vehicle located at a repair facility or other location (Kelly affidavit, para. 12, and "Abstract" of the Patent (Exhibit F to Kelly affidavit)).

22. Modern automobiles can have up to 50 computer modules within them that can control up to 80 percent of an automobile's mechanical and electrical functions, such as braking, steering control, traction control, collision avoidance, and fuel oxygen mixture (Kelly affidavit, para. 13). When an automobile develops a fault associated with one of these functions, the associated computer module generates what is known as a "trouble code" (Kelly affidavit, para. 13). In order to properly diagnose and repair the fault, a mechanic must be able to electronically scan the automobile's computer modules to determine the car's trouble codes (Kelly affidavit, para. 13).

23. To perform a scan, the AsTech Product is connected to an automobile's data link connector, a standardized connector that is often located under the dashboard (Kelly affidavit, para. 14). The AsTech Product is then connected via the Internet to a second AsTech Product located at a Repairify facility in Plano, Texas, or Jacksonville, Florida (Kelly affidavit, para. 14). The second AsTech Product is in turn connected to a scan tool appropriate to the

particular automobile being scanned (Kelly affidavit, para. 14). This scan tool is located at the same Repairify facility (Kelly affidavit, para. 14). A master Repairify technician then uses the scan tool to scan the automobile's computer modules over the Internet and generate a report of the scan results (Kelly affidavit, para. 14). In addition to scanning, the AsTech Product can be used to program an automobile's computer modules, for example reprogramming an automobile's airbag control module following a collision (Kelly affidavit, para. 14) (See also the Demonstrative Chart attached as Exhibit 5).

24.     The systems and methods for diagnosing a vehicle using the AsTech Product are covered by the Patent, which Repairify also acquired in connection with the acquisition of the AEST/CDS assets (Kelly affidavit, para. 15; and the Patent, Exhibit F to Kelly affidavit). Again, Olsen is listed on the Patent as an Inventor of the AsTech Product (Exhibit F to Kelly affidavit).

25.     The AsTech Product and related services allow a repair facility (as a customer of Repairify) to scan vehicles with true OEM (original equipment manufacturer) factory scan tools without the need to purchase and maintain multiple expensive OEM factory scan tools (Kelly affidavit, para. 16).

26.     Scan tools can generally be classified into two categories: OEM factory scan tools and aftermarket scan tools (Kelly affidavit, para. 17). OEM factory scan tools are produced by each individual automaker, e.g., Ford. An automaker's OEM scan tool provides complete and up-to-date software that can scan and program all of the computer modules in vehicles made by that OEM

(Kelly affidavit, para. 17). A downside with OEM factory scan tools, however, is a repair facility must purchase and maintain multiple OEM factory scan tools to cover multiple makes of automobiles, which can be prohibitively expensive (Kelly affidavit, para. 17). Certain OEM factory scan tools can cost more than $100,000. The AsTech Product, however, gives a repair facility access to a broad selection of OEM factory scan tools located at Repairify's facilities (Kelly affidavit, para. 17). Thus, repair facilities, and ultimately the vehicle owners, save the cost of purchasing and maintaining an array of OEM factory scan tools, and at the same time receive the benefit of the comprehensive and up-to-date scanning capabilities offered by OEM factory scan tools (Kelly affidavit, para. 17).

27. Aftermarket scan tools, on the other hand, are made by companies not affiliated with OEMs (Kelly affidavit, para. 18). These scan tools provide basic scanning and programming capabilities for many cars, but lack the comprehensive capabilities of OEM factory scan tools (Kelly affidavit, para. 18). Indeed, even the highest end aftermarket scan tools will not likely provide coverage for all computer modules for most cars, and will be one to two model years out of date (Kelly affidavit, para. 18).[4]

---

[4] AirPro will likely take issue with Repairify's position that OEM scan tools are superior to aftermarket scan tools because, on information and belief, AirPro relies predominately on the use of aftermarket scan tools, as opposed to OEM scan tools. That issue, however, is irrelevant to this motion. Rather, because both AirPro and Repairify provide the same type of services to the same market and/or potential customer base, i.e. diagnostic and program scanning services to vehicle repair facilities throughout the United States, the primary issue before the Court is whether defendants Olsen and Rodriquez have breached their covenant not to compete with Repairify.

28.	Repairify's revenues are derived exclusively from the sale and servicing of the AsTech Product for mechanics and repair facilities that have purchased the AsTech Product (Kelly affidavit, para. 19).

29.	Section 688.002(4) defines a trade secret to mean:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

30.	The information revealed in the Patent is public. But the non-public information about the AsTech Product constitutes trade secrets. The systems and methods for use of the AsTech Product and its scanning services comprise a unique product that has significant independent economic value to Repairify.[5] Again, (i) Repairify paid $4,750,000.00 for AEST's contracts with its employees, including Olsen and Rodriguez, customer lists, systems, methods and patented technologies associated with the AsTech Product and (ii) all of Repairify's revenues are generated through the sale and the servicing of the AsTech Product and the systems and methods thereof (Kelly affidavit, para. 20).

---

[5] For example, the computer programming, which allows the AsTech Product to remotely use OEM scan tools to diagnose a vehicle's problems through the vehicle's computer modules, is a trade secret (Kelly affidavit, para. 20, n. 1).

31.     The AsTech Product also derives its independent economic value to Repairify by virtue of it being a patented device and process, which protects the AsTech Product from duplication by others through improper means (Kelly affidavit, para. 21).    Repairify undertakes significant efforts to maintain the confidentiality of the details of how the AsTech Product works, other than the publicly available Patent information (Kelly affidavit, para. 21).

32.     Repairify required Olsen and Rodriguez to agree not to compete with Repairify to protect Repairify from improper use or disclosure of, among other things:  (i) Olsen's and Rodriguez's knowledge and training regarding the AsTech Product; (ii) valuable and highly confidential technical, business, customer, and financial information relating to the AEST/CDS business that was purchased; and (iii) Repairify's substantial relationships with existing customers who use the AsTech Product and its prospective customers that Repairify identified as potential purchasers of the AsTech Product (Kelly affidavit, para. 22).

33.     Repairify also guards its trade secrets through anti-hacking protocols.  To gain access to the trade secrets, employees are assigned passwords and sign on information.  Upon termination, former Repairify employees' access is immediately terminated.  And prospective employees must first pass a criminal background check and drug testing (Kelly affidavit, para. 23).

34.     Repairify has a legitimate business interest in protecting those interests in North Florida and wherever else Repairify was conducting business during Olsen and Rodriguez's employment.  *North American Products v. Moore*,

196 F.Supp.2d 1217, 1228 (M.D. Fla. 2002) ("Where an employee, as here, gains substantial knowledge of his former employer's customers, their purchasing history, and their needs and specifications it follows that the employer has a legitimate business interest under the statute.").

35.     As noted, prior to Repairify's acquisition of the AEST/CDS assets, Olsen was Director of Advanced Remote Diagnostics and Technical Support for CDS at AEST (Kelly affidavit, para. 24).

36.     Upon the AEST/CDS acquisition, Repairify hired Olsen as Director of Advanced Remote Diagnostics and Technical Support, which is the position he held at AEST/CDS (Kelly affidavit, para. 25).  In that role *and as an inventor of the AsTech Product*, Olsen had access to highly confidential technical, business, customer, and financial information relating to the CDS business (Kelly affidavit, para. 25).  For instance, Olsen (i) knows Repairify's pricing models, (ii) knows Repairify's customer contacts and (iii) works for a competitor and can undermine Repairify's customer base.  Olsen also had extensive knowledge of the newer generation of the AsTech Product, known as AsTech 2, including its improved technical specifications, software, and capabilities, none of which are public and all of which are closely guarded (Kelly affidavit, para. 25).

37.     Rodriguez gained largely the same Repairify confidential information during his tenure at Repairify (Kelly affidavit, para. 26).

38.     Consequently, in consideration of their employment at Repairify and to protect the Repairify's business interests, Repairify required Olsen and

Rodriguez to execute the Olsen and Rodriguez Agreements, both of which include a non-disclosure clause and a non-compete clause (Kelly affidavit, para. 27).[6]

39.     Repairify has a legitimate business interest in the extraordinary and specialized training Olsen and Rodriguez gained at *AEST* (and then at Repairify). The AEST assets Repairify bought in 2015 included AEST's "agreements for the employment of any executive, employee," as "Transferred Assets relating to the Business to which [AEST] is a party" (Asset Purchase and Contribution Agreement, pages 22-23, § 3.11(a)(ix), Exhibit C to the Kelly affidavit). Accordingly, Repairify bought the benefits AEST's employment contracts with Olsen and Rodriguez, pursuant to which Olsen and Rodriguez gained extraordinary and specialized training (Kelly affidavit, para. 28).

B.      The non-competition provisions in the Olsen and Rodriguez Agreements are reasonably necessary to protect Repairify's legitimate business interests.

40.     In this Circuit, where the covenant not to compete is designed to protect confidential information, and the former employee's new employment

---

[6] Section 1 of the employment agreements includes the same non-disclosure clause:

> 1.  Confidential Information.  The Employee covenants and agrees with the Company that he shall not, either while he is a Company employee or at any time two (2) years thereafter, use for his own benefit, or for the benefit of any other person, or to the detriment of the Company, or disclose to any person, firm or corporation, any secret, private or confidential information or other proprietary knowledge of and concerning the business or affairs of the Company which he may have acquired in the course of, or as incident to, his employment or other association with the Company (whether relating to past, present or prospective clients, customers, associates and employees or otherwise).

places the employee in a position to use the former employer's confidential information, the covenant is reasonably necessary to protect a legitimate business interest and should be enforced. *Proudfoot Consulting*, 576 F.3d at 1235 ("the district court's conclusion that Gordon's employment with Highland endangered the information that he received at Proudfoot (a conclusion that Gordon does not challenge) provides a basis to enforce the competitor non-compete covenant.").

41.    Olsen and Rodriguez are in a position to disclose Repairify's confidential business information to AirPro and use it adverse to Repairify (Kelly affidavit, para. 29). Olsen was a co-inventor of the AsTech Product. Olsen and Rodriguez (as a Repairify Master Technician) were privy to Repairify's confidential financial, technical, and customer information.

42.    Also, Rodriguez (regarding existing customers) and Olsen had substantial contact with Repairify's relationships with prospective and existing customers (Kelly affidavit, para. 30).

43.    Thus, Olsen's and Rodriguez's agreements not to compete with Repairify wherever Repairify does business are reasonably necessary to protect Repairify's legitimate business interests, which include:

    a.    Repairify's trade secret and other valuable confidential business information that Olsen and Rodriguez were privy to in performing their Repairify employment duties;

    b.    Repairify's substantial relationships with prospective and existing customers, with which Olsen and Rodriguez had substantial contact; and

     c.     Olsen and Rodriguez' extraordinarily specialized training and knowledge about how to deliver the diagnostic and programming services for vehicle enduser repair facilities throughout the United States.

     C.     <u>The two year terms of the covenants not to compete are reasonable</u>.

44.     In general, restrictive covenants with a duration of more than two years are presumed unreasonable, while those which are less than six months in duration are presumed reasonable. § 542.335(1)(d)(1), Fla. Stat.  However, if the party is able to prove a legitimate business interest in confidential trade secret information, those durational presumptions are lengthened, with any restraint greater than ten years in duration presumed unreasonable and restraints less than five years in duration presumed reasonable.  § 542.335(1)(e), Fla. Stat. ("In determining the reasonableness in time of a postterm restrictive covenant predicated upon the protection of trade secrets, a court shall presume reasonable in time any restraint of 5 years or less and shall presume unreasonable in time any restraint of more than 10 years.").

45.     Because the purpose of the covenant not to compete contained in the Olsen and Rodriguez Agreements was to protect Repairify's confidential information, the two year term of Olsen's and Rodriguez' non-compete agreements is presumptively reasonable.  *See also Technomedia Solutions v. Scopetto*, 2013 WL 6571558, *12 (M.D. Fla., December 13, 2013) ("In Florida, a two-year restriction has been considered reasonable on its face;" citing *Sentry Ins.*

*v. Dunn*, 411 So.2d 336, 337 (Fla. 5th DCA 1982) (two-year restriction prohibiting defendant from soliciting plaintiff's customers was reasonable); and *Tomasello v. de Los Santos*, 394 So.2d 1069, 1072 (Fla. 4th DCA 1981) (restriction not to compete for two years following termination of employment was facially reasonable)).[7]

46.     Olsen and Rodriguez's full two year non-compete restrictions should begin on the date of an injunction in order to provide Repairify with the full two years it bargained for:

> We agree with Rollins' claim on cross-appeal that the trial court erred in scheduling the injunction to run from July 18, 1986, to December 19, 1987, a period of one year and five months. Rollins is entitled to the full duration of the two-year non-competition covenant. *Capelouto v. Orkin Exterminating Co. of Florida,* 183 So.2d 532, 534–35 (Fla.), *appeal dismissed,* 385 U.S. 11, 87 S.Ct. 78, 17 L.Ed.2d 10 (1966); *Cordis Corp. v. Prooslin,* 482 So.2d 486, 491 n. 3 (Fla. 3d DCA 1986). Having found that the two-year duration was reasonable, the trial court could not shorten the injunction period specified in the agreement. Apparently, the trial court deemed the injunction to be in effect from December, 1985, when Kverne was served with Rollins' complaint and, thus, calculated that six months of the two years had already elapsed. However, the trial court's scheme "ignores the fact that appellant has participated in the prohibited activities

---

[7] To the extent the Court might find that the temporal or geographic restrictions in the Olsen and Rodriguez Agreements are not reasonably necessary to protect Repairify's legitimate business interests, the Court must modify the restrictions to what it finds are reasonably necessary.  § 542.335(1)(c), Fla. Stat. ("If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests"); *Proudfoot Consulting*, 576 F.3d at 1231; and *Technomedia Solutions*, 2013 WL 6571558, at *8.

during the course of the litigation." *Capelouto*, 183 So.2d at 534–35. Accordingly, we reverse that portion of the final judgment regarding the effective dates of the injunction and remand with directions to extend the injunction for the full two years.

> *Kverne v. Rollins Protective Services*, 515 So.2d 1320, 1321-22 (Fla. 3d DCA 1987), see also, *Florida Digestive v. Colina*, 202 So.3d 94, 97 (Fla. 2d DCA 2016).

    D.    <u>The geographic restrictions are reasonable</u>.

47.    Because AirPro competes with Repairify throughout the United States, Repairify has the right to enjoin Olsen and Rodriquez from competing with Repairify in the course of their employment with AirPro.

48.    In *Proudfoot Consulting*, the Eleventh Circuit considered a non-compete agreement where the employer operated internationally, with a headquarters in West Palm Beach and offices in New York and Atlanta. The court upheld the district court's finding that "North America and Europe would be a reasonable geographic area because Proudfoot [the employer] conducts its operations in that territory and Gordon [the employee] was assigned to that territory." *Proudfoot Consulting*, 576 F.3d at 1231.

    E.    <u>Olsen and Rodriguez are breaching their covenants not to compete by working for AirPro.</u>

49.    Defendant *AirPro's* counterclaim alleges that both AirPro and Repairify are "in the business of performing scanning of computer modules in

automobiles and other vehicles." (AirPro counterclaim (Doc. 18), paras. 7 and

10). Moreover, AirPro alleges that Repairify and AirPro are direct competitors,

*"throughout the United States"*:

> Repairify/CDS competes directly with AirPro Diagnostics throughout the United States and offers a competing product, to wit: the AsTech Product.
>
> AirPro counterclaim (Doc. 18), ¶ 20.

50.     In the Eleventh Circuit, "a party is bound by the admissions in his

pleadings." *Best Canvas Products & Supplies v. Ploof Truck Lines*, 713 F.2d 618,

621 (11th Cir. 1983); *see also Hill v. FTC*, 124 F.2d 104, 106 (5th Cir. 1941)

("judicial admissions are proof possessing the highest possible probative value.

Indeed, facts judicially admitted are facts established not only beyond the need of

evidence to prove them, but beyond the power of evidence to controvert them.").

51.     As noted, Mr. Margol was the CEO of AEST, overseeing its CDS

business prior to the sale to Repairify. Mr. Margol's employment at AEST ended

upon the sale of the assets to Repairify (Kelly affidavit, para. 33).

52.     In April 2016, shortly after the sale of the assets to Repairify, Mr.

Margol co-founded AirPro, and now serves as its CEO and Assistant Member (see

printouts from Mr. Margol's Linkedin page and the Florida Division of

Corporation's webpage, Exhibit G to Kelly affidavit). The AirPro website,

http://airprodiagnostics.com, shows that AirPro competes directly with Repairify

in North Florida and throughout the United States, and offers a competing product

to the AsTech Product called the AirPro (the "AirPro Product"), as well as

competing automobile scanning services (see printout from AirPro's webpage, Exhibit H to Kelly affidavit).[8]  According to AirPro's advertisements and other statements, the AirPro Product comprises an aftermarket scan tool and does not make use of OEM factory scan tools (Kelly affidavit, para. 34).

53.    In June 2016, without providing notice to Repairify, Olsen became AirPro's Executive Director of Operations (see printout from Olsen's Linkedin page, Exhibit I to Kelly affidavit).  Even prior to Olsen's involvement with AirPro, Repairify raised concerns with Olsen that he was not abiding by the terms of the Olsen Agreement (see March 21, 2016 letter Repairify sent to Olsen, Exhibit J to Kelly affidavit).  In light of the earlier concerns raised by Repairify, Olsen's failure to inform Repairify of his intention to work for AirPro in competition with Repairify demonstrates Olsen's bad faith.  AirPro has known of Olsen's non-compete and non-disclosure agreement with Repairify at least as early as service of process in this action.  But AirPro nevertheless hired Olsen and Rodriguez, inducing them to breach their employment agreements with Repairify and allow AirPro to unfairly compete with Repairify in the market.[9]

---

[8] Olsen and Rodriguez both work out of—and therefore compete against Repairify at—AirPro's headquarters in Jacksonville, which by any definition is within North Florida.

[9] Additionally, Olsen has (i) lingered around Repairify's booth at national industry events and solicited Repairify's potential customers, (ii) solicited insurance companies to cause repair shops to contract with AirPro, as opposed to Repairify, and (iii) on behalf of AirPro, spoken on panels and become a member of working committees appointed by national industry associations, including Collision Industry Conference (ciclink.com), Specialty Equipment Market Association (sema.org), and the International Autobody Congress & Exposition (facebook.com/NACEexpo) (Kelly affidavit, para. 35).

F.    Olsen's meritless affirmative defenses

54.    Olsen raises a host of affirmative defenses (Doc. 40), none of which have merit.  For example:

a.    Olsen alleges that he was fired because he raised issues about another employee who Olsen "believed" "had accessed child pornography on CDS's premises using CDS' computers and network" (Doc. 40, pages 9-10). Olsen is confusing his employers.  The other employee in question *never* worked for Repairify; he worked for AEST when Mr. Margol was its CEO (Kelly affidavit, para. 36; Lamey affidavit, para. 7).  As noted above, on July 28, 2015, Repairify bought AEST's CDS operating assets (Kelly affidavit, para. 36).  AEST fired the employee in question (Lamey affidavit, para. 7).  While Olsen alleges that he was "outraged" because the other employee should have been "reported to the authorities," *Repairify* had no duty to report the other employee—which Repairify never employed—to the authorities (Kelly affidavit, para. 36).

b.    Olsen alleges his employment agreement is not with Repairify (Doc. 40, page 7).  But the Olsen Agreement is entitled "REPAIRIFY, INC. EMPLOYMENT AGREEMENT" and at the *beginning* says "In consideration of Repairify, Inc. ("Company") agreeing to employ the undersigned ("Employee"), the undersigned Employee covenants and agrees as follows…" (Exhibit A to Kelly affidavit).

c.    Olsen alleges the Olsen Agreement is not enforceable because it precludes him from competing against Repairify in North Florida, which allegedly

is ambiguous and undefined (Doc. 40, page 8). "North Florida" is not defined in the Agreement, but it is not ambiguous. The first result of a Google search for the definition of North Florida is https://en.wikipedia.org/wiki/North_Florida, which notes that "North Florida" is "one of Florida's three most common 'directional' regions" and includes the counties shown in red:



Kelly affidavit, para. 38.

55.    For these reasons, Olsen's meritless affirmative defenses do not preclude entry of a preliminary injunction against him.

### III.    **Repairify will be irreparably injured unless the injunction issues**.

56.    Under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." § 542.335(1)(j), Fla. Stat.; *see also Pirtek USA v. Twillman*, 2016 WL 5846978 (M.D. Fla., Oct. 6, 2016) ("Irreparable harm is presumed under Florida law where, as here, the proponent of injunctive relief

has adequately pled the violation of a non-compete agreement."); *North American Products*, 196 F.Supp.2d at 1228; and *Don King Products v. Chavez*, 717 So.2d 1094, 1095 (Fla. 4th DCA 1998)).

57.     Because Repairify has established that Olsen and Rodriguez are competing with Repairify throughout the United States in violation of their agreements, Repairify is entitled to the presumption that Repairify has been and will be irreparably harmed if Olsen and Rodriguez are not enjoined from competing with Repairify.

58.     Olsen's employment at AirPro is irreparably harming Repairify. Olsen is able to use (and misrepresents) Repairify's confidential, trade secret information against Repairify.  Olsen's competition against Repairify has caused the loss of one Repairify customer and continues to undermine Repairify's goodwill and brand in the market (Kelly affidavit, para. 39).

**IV.     The economic hardships to Repairify if Olsen and Rodriguez are not enjoined outweigh any injunctive harm to Olsen and Rodriguez.**

59.     The economic harm to Repairify that will result if Olsen and Rodriguez are not enjoined is substantial and outweighs any economic injunctive harm to Olsen and Rodriguez through enforcement of their agreements.  Repairify paid $4,570,000.00 for AEST's assets, which included the very valuable AsTech Product Patent, on which Olsen was listed as an inventor.  The AsTech Product and the associated scanning services are Repairify's only source of income.  If Olsen and Rodriguez are not enjoined, they will be able to use Repairify's

confidential information to damage Repairify as they compete with Repairify throughout the United States in violation of their agreements. Any harm Olsen and Rodriguez might suffer if they are required to abide by their agreements not to compete against Repairify is outweighed by the substantial harm Olsen and Rodriguez are presently causing (and will continue to cause) Repairify if they are allowed to disregard their covenants not to compete (Kelly affidavit, para. 40).

**V.     The public interest weighs in favor of requiring Olsen and Rodriguez to comply with their employment agreements.**

60.     The public interest weighs in favor of requiring Olsen and Rodriguez to comply with their agreements. That is because "there is a benefit to the enforcement of a valid covenant not to compete and encouraging people to adhere to contractual obligations." *R.J. Gators v. MBC Restaurants*, 2005 WL 4655379, at *5 (M.D. Fla., Nov. 9, 2005) (citing *Burger King v. Lee,* 766 F.Supp. 1149, 1157 (S.D. Fla. 1991) ("The public interest is certainly disserved by Defendant's continuing disregard of his contractual commitments and undertakings.")).

61.     Rule 65(c) requires that a preliminary injunction may only be granted "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of security here should be Olsen's and Rodriguez's annual salaries at Repairify, $85,000 and $50,000, respectively (Kelly affidavit, para. 41).

62.     A proposed injunction is attached as Exhibit 6 pursuant to Local Rules 4.06(b)(1) and 4.05(b)(3)(iii).

WHEREFORE, Repairify moves the Court to preliminarily enjoin (i) Olsen and Rodriguez from competing with Repairify throughout the United States and (ii) AirPro from tortiously interfering with the Olsen and Rodriguez Agreements.

SMITH HULSEY & BUSEY

By     */s/ James A. Bolling*
          Michael E. Demont
          James A. Bolling

Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
jbolling@smithhulsey.com

Attorneys for plaintiff, Repairify, Inc.

**Exhibits to Repairify's motion for preliminary injunction**

| Exhibit | Description |
|---|---|
| 1 | Douglas Kelly's affidavit |
| A | Repairify Employment Agreement with Charles Olsen |
| B | Repairify Employment Agreement with Wilfredo Rodriguez |
| C | Asset Purchase Agreement, pursuant to which Repairify bought AES's assets in AES's bankruptcy case |
| D | Bill of Sale, pursuant to which Repairify bought AES's assets in AES's bankruptcy case |
| E | Printout of Repairify's website |
| F | Repairify's patent |
| G | Printouts from Lonnie Margol's Linkedin page and the Florida Division of Corporation's webpage regarding AirPro |
| H | Printout from AirPro's webpage |
| I | Printout from Charles Olsen's Linkedin page |
| J | 3/21/16 Letter from Repairify to Charles Olsen |
| 2 | Kristi Lamey's affidavit |
| | Repairify Employment Agreement with Charles Olsen |
| | Repairify Employment Agreement with Wilfredo Rodriguez |
| 3 | Transcript of November 4, 2014 proceedings in the bankruptcy case of *AES Technologies*, LLC; Case No. 3:14-bk-05397-PMG |
| 4 | November 4, 2014 order entered by The Honorable Paul M. Glenn on in AEST's bankruptcy case (Doc. 19 in that case) |
| 5 | Demonstrative Chart |
| 6 | Repairify's proposed preliminary injunction |

**<u>Certificate of Service</u>**

I certify that on December 27, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.

_____*/s/ James A. Bolling*_____
Attorney

947216.2