**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

REPAIRIFY, INC.,

    Plaintiff,

v.   Case No. 3:16-cv-984-J-34JRK

AIRPRO DIAGNOSTICS, LLC,
CHARLES OLSEN and
WILFREDO RODRIGUEZ,

    Defendants.

## REPAIRIFY'S REPLY MEMORANDUM

Plaintiff Repairify, Inc., files this reply memorandum in support of Repairify's motion for a preliminary injunction (Doc. 41), and says:

1. After accepting the position of Director of Advanced Remote Diagnostics and Technological Support for Repairify in August 2015 (and after executing Repairify's employment agreement containing the non-compete provision at issue), Repairify asked Olsen to move from Repairify's Jacksonville office to its Texas office. Olsen saw this as an opportunity to try and "leverage up" his compensation terms with Repairify. Olsen wrote to Doug Kelly, the CEO, on November 8, 2015 with requests for increased compensation and benefits. See Exhibit E to Olsen Affidavit (Doc. 47-6).

2. In the second paragraph of his e-mail to Mr. Kelly, Olsen wrote:

First, I'm incredibly excited by the recent developments and this opportunity. Bringing this company from an idea to a reality has been the experience of a lifetime, and it's my dream to continue pushing this forward. As a co-inventor of the Remote Vehicle Programming System and Method Technology, I have a vested interest in the technological and financial success of Repairify and asTech. As you know, the implications of this technology and method are enormous. I am

honored to have been a key player in its development since inception. I look forward to playing a key part of this team to bring the asTech and remote diagnostic development to its full potential in numerous diverse markets.

3. Soon thereafter, Repairify and Olsen parted ways. Since then, Olsen has undertaken every effort to breach his non-competition provision by working with a direct competitor and by using the skills, specialized training, and confidential, trade secret information (especially his knowledge of the strengths and weaknesses of the asTech product)—all adversely to Repairify's legitimate business interests.

4. Attached as Exhibit A to Doug Kelly's Declaration (attached as Exhibit 3) is AirPro's September 19, 2016 press release. AirPro's press release discusses asTech's strengths and weaknesses with computer interfaces, protocols and translations. AirPro could not have had this information except from Olsen, and to a lesser extent from Rodriguez. (Kelly Declaration, para. 3).

5. In April 2015, Mr. Kelly engaged in due diligence in connection with Repairify's ultimate July 2015 purchase of AEST's assets. Lonnie Margol was no longer employed by AEST at this time. Mr. Kelly suggested and AEST agreed to perform testing and trials to identify the asTech's weaknesses and then begin research and development to correct the weaknesses. Olsen was intimately involved in the testing, trials and research and development at this time. Lonnie Margol was not involved. (Kelly Declaration, para. 4).

6. AEST, and then Repairify, maintained the confidentiality of the results of these tests and trials and the research and development that led to the second generation asTech2 device, which corrected these weaknesses. AEST and then Repairify used the same means to protect the confidentiality of this information that is described in Mr. Kelly's previous affidavit (Doc. 41-1). Repairify released asTech2 on July 5, 2016. (Kelly Declaration, para. 4).

7. Olsen is also using Repairify's confidential, trade secret results of Repairify's testing, trials, and research and development, including the identification of asTech's weaknesses, in his participation in national collision trade groups. Lonnie Margol's affidavit (Doc. 47-16, para. 44) says that "Olsen has assisted the industry in accurately identifying which tools provide true OEM compliant functionality and the benefits versus weaknesses of these tools and or processes (see Exhibit J)." Exhibit J to Margol's affidavit (Doc. 47-26) is Olsen's remote scanning "analysis" for a national industry association, Collision Industry Conference ("CIC"), committee, of which he is the chairman. The committee met regarding Olsen's "analysis" at the CIC meeting on January 14, 2017. Olsen's "analysis" is biased in favor of AirPro and against Repairify. (Kelly Declaration, para. 5).

8. In Margol's Exhibit J, Olsen purports to describe Repairify's asTech device under the thinly veiled heading "Remote connected scan tool via aftermarket IP connected interfaces" (pages 5-6 of 7) and AirPro's device under the thinly veiled heading "Direct connected scan tool with remote access (pages 6-7 of 7). Under the "Weaknesses" heading (page 6 of 7) for asTech, Olsen purports to describe asTech's weaknesses. Olsen's second bullet pointed "weakness" says the asTech device (which Olsen calls the "aftermarket" (device)) has "interface limitations." These limitations, however, and as discussed above, do not apply to the second generation asTech2 device, which Repairify released on July 5, 2016. And most of the "weaknesses" Olsen ascribes to asTech are equally applicable to AirPro's device—but Olsen does not list them as AirPro weaknesses. (Kelly declaration, para. 6).

9. While Olsen's purported descriptions of asTech's weaknesses are not true and are misleading, they gain credibility because Olsen was an asTech co-inventor and he had access to proprietary information regarding its strengths and weaknesses—and is causing and will

3

continue to cause imminent harm to Repairify's brand (Kelly declaration, para. 7). This supports and injunction. *Lombard Medical v. Johannessen*, 729 F.Supp.2d 432, 434 and 439 (D. Mass. 2010).

10. Olsen and Rodriguez's response does not otherwise negate Repairify's right to a preliminary injunction. The arguments presented by the Defendants are addressed in the order presented below.

11. Defendants argue that "Rodriguez is not an employee of AirPro" (Doc. 47, page 2) because "Nationwide Parts Distributors pays [Rodriguez] an annual salary" (Docs. 47-12, para. 40, and 47-16, para. 18). Nationwide Parts Distributors, Inc. was formed by Mr. Margol and is affiliated with defendant AirPro Distributors, LLC; Mr. Margol is a principal of both—and both companies have the *same address* (Doc. 47-16, para. 18, and printouts from the Division of Corporations' webpage attached as Composite Exhibit 1). Moreover, both Margol and Rodriguez admit that Rodriguez "does assist AirPro Diagnostics with scanning from time to time" (Docs. 47-16, para. 18, and 47-12, para. 41). AirPro admits that "Repairify/CDS competes directly with AirPro Diagnostics throughout the United States and offers a competing product, to wit: the AsTech Product" (AirPro counterclaim (Doc. 18, ¶ 20). Rodriguez therefore also competes with Repairify nationwide.

12. In Repairify's motion (Doc. 41, para. 39), Repairify showed that Repairify bought Olsen's and Rodriguez's employment agreements with AEST:

> Repairify has a legitimate business interest in the extraordinary and specialized training Olsen and Rodriguez gained at *AEST* (and then at Repairify). The AEST assets Repairify bought in 2015 included AEST's "agreements for the employment of any executive, employee," as "Transferred Assets relating to the Business to which [AEST] is a party" (Asset Purchase and Contribution Agreement, pages 22-23, § 3.11(a)(ix), Exhibit C to the Kelly affidavit). Accordingly, Repairify bought the benefits AEST's employment contracts with

4

Olsen and Rodriguez, pursuant to which Olsen and Rodriguez gained extraordinary and specialized training (Kelly affidavit, para. 28).

13. Defendants argue this is "false and extremely misleading" because Olsen and Rodriguez had no employment agreements with AEST (Doc. 47, page 3). But all employees have contracts with their employer:

> As a general rule, the relationship of employer and employee is that which arises out of a contract of employment, express or implied...
>
> 2A Fla.Jur. 2d, Agency and Employment, § 166.[1]

14. Moreover, AEST's Employee Handbook provides that all AEST employees, which included Olsen and Rodriguez, had to sign non-disclosure agreements to protect AEST's confidential and trade secret information:

> 106 NON-DISCLOSURE
> The protection of **confidential business information and trade secrets** is vital to the interests and the success of Automotive Electronic Solutions Technologies. Such confidential information includes, but is not limited to, the following examples:
>
> | | |
> |---|---|
> | Compensation data | New materials research |
> | Customer lists | Pending projects and proposals |
> | Customer preferences | Research and development strategies |
> | Financial information | Technological data |
> | Labor relations strategies | Sales Manuals |
> | Marketing strategies | Supplier information |
>
> **All employees are required to sign a non-disclosure/confidentiality agreement as a condition of employment**.
>
> AEST Employee Handbook, attached to Lisa Brown's Declaration, which is attached as Exhibit 2 (emphasis added).

---

[1] *See, also, Knight v. Palm City*, 78 F.Supp.2d 1345, 1347–48 (S.D. Fla. 1999) ("An analysis of Florida cases satisfies the Court that terminable-at-will employment agreements possess the essential attributes of contracts. In Florida, the essential elements of a contract are offer, acceptance, and consideration. *See Donahue v. Davis,* 68 So.2d 163 (Fla.1953).").

5

15. So, Olsen and Rodriguez had employment contracts with AEST and pursuant to Repairify's agreement to purchase AEST's business, which the Bankruptcy Court approved, AEST assigned those contracts to Repairify. Repairify therefore has a protectable legitimate business interest in (i) the confidential information that Olsen and Rodriguez gained at AEST and (ii) the extraordinary and specialized training and experience Olsen and Rodriguez gained at Repairify.

16. Defendants argue that Olsen was relieved of his obligations in the Repairify employment agreement because Repairify materially breached that agreement when Repairify terminated Olsen without justification and without cause (Doc. 47, pages 4 and 17- 19).

17. But Olsen was an at-will employee (Kelly Declaration, para. 14). Even if Repairify's termination of Olsen was not justified or without cause, Repairify did not thereby breach the Olsen employment agreement:

> Under Florida law, if Laney was an at-will employee, her employment could be terminated for any or no reason, and as a matter of law she could not state a cause of action for her termination.
>
> *Laney v. Hosp. Bd. of Directors*, 2010 WL 5161367, at *3 (M.D. Fla. 2010).[2]

18. Defendants argue that to meet the "substantial likelihood of success" requirement for a preliminary injunction, there must be no "dispute as to the rights of the parties," citing a Florida state court case. But in federal court, to meet this requirement, Repairify must only show

---

[2] Although irrelevant in this action, Repairify had cause to fire Olsen. Olsen required that Repairify meet his exorbitant demands for him to continue to work for Repairify (Doc. 47-6 (Exhibit E to Olsen affidavit)) and Repairify terminated him for that and refusing to show up for work when his demands were not met (Doc. 47-7, Exhibit F to Olsen's affidavit). Olsen also says Doug Kelly said Olsen would be awarded 30,000 shares of Repairify stock, which would vest if Olsen worked for Repairify for five years (Doc. 47-1, para. 50). But later that month (i) Olsen made different and higher demands for his continued employment at Repairify (Doc. 47-6) and (ii) Repairify fired Olsen (Doc. 47-1, para. 55), so no stock could have vested. Additionally, any claim for stock is barred by the statute of limitations. *LaRue v. Kalex Dev't*, 97 So.3d 251, 256 (Fla. 3d DCA 2012). But there are plenty of other bases to reject Olsen's stock argument.

it is likely or probable to succeed on the merits. *Schiavo ex rel. Schindler v. Schiavo*, 357 F.Supp.2d 1378, 1383 (M.D. Fla.), aff'd, 403 F.3d 1223 (11th Cir. 2005) ("A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain,* success.").

19. Defendants argue that Repairify must show that Olsen and Rodriguez use Repairify's confidential and trade secret information at AirPro (Doc. 47, pages 6 and 9). But the cases defendants cite for this proposition address whether a non-solicitation of customers and use of confidentiality information clauses should be enforced by injunction. For example, *Sabina v. Dahlia Corp.*, 650 So.2d 96, 97 (Fla. 2d DCA 1995), addresses restrictive covenants to not "call upon or solicit…customers…" and to not "divulge confidential or trade secret information…" Here, Repairify seeks to enforce the "covenant not compete" in each of the Olsen and Rodriguez employment agreements.

20. Defendants argue that Repairify fails to show its confidential and trade secret information with specificity and instead "makes generalized conclusory statements referencing 'systems' or 'methods' or 'computer programming'" (Doc. 47, page 6). Repairify specifically described its trade secret computer programming (Doc. 41, n.11). Repairify also identified its trade secret customer information (Doc. 41, para. 32), including customer contact information (Doc. 41, para. 36),[3] and Olsen's and Rodriguez's knowledge and training regarding the asTech product (Doc. 41, para. 32).

---

[3] Repairify does not maintain the confidentiality of its customers' business identities, *generally*. Repairify does *specifically* maintain the confidentiality of its customer contact information (identity of individuals at body shops and the individuals' cell phone numbers and e-mail addresses). This information is not public knowledge. Repairify had to pay AEST for this information and AEST had to spend years of effort to cultivate these customers and obtain their contract information. See Kelly Declaration, para. 8, and McIntyre Declaration, paras. 5-6, attached as Exhibit 4). That information is a trade secret. *Int'l Hair v. Simply Organic*, 2011 WL 5359264, at *4–5 (M.D. Fla. 2011), *R&R adopted as modified*, 2011 WL 5360098 (M.D. Fla. 2011) ("Here, Plaintiff's customer list qualifies for protection as a trade secret.

21.     Olsen is using Repairify's confidential, trade secret results of the tests and trials and the research and development that led to the second generation asTech2 device in ways that continue to damage Repairify's brand. (Kelly Declaration, paras. 4-9).

22.     Defendants argue that Repairify has not been specific about the substantial relationships Olsen and Rodriguez had with Repairify's customers (Doc. 47, pages 7-10). Repairify showed that Olsen and Rodriguez had substantial relationships with Repairify's customers (Doc. 41, para. 42). Olsen's affidavit also shows that (Doc. 47-1, pages 4-5). Olsen swears that he directed AEST's support staff in support for clients, and that he trained and coached AEST client customers. Rodriguez says much the same in his affidavit (Doc. 47-12, pages 4-5). Olsen's Linkedin page also shows that he provided collision repair shops diagnostic services (Doc. 41-10, page 3 of 7).

23.     Defendants argue Repairify has not shown the required extraordinary *or* specialized training required by § 542.335(1)(b)(5) (Doc. 47, pages 10-12). As shown above, however, Repairify has a protectable, legitimate business interest in the training and experience gained at AEST and Repairify.

24.     That on the job training was extraordinary *and* specialized.[4]

25.     As shown by Olsen's own affidavit, (Doc. 47-1, pages 4-5), while at AEST, Olsen gained extraordinary on the job training in remote diagnostics:

    a.      Olsen developed AEST's remote internet connection interfaces for remote scan tools using OEM and aftermarket diagnostics, i.e., the asTech (of which Olsen was a co-patentee (Doc. 47-1, para. 10));

    b.      Olsen developed and directed in-house training for asTech;

---

[4] On the job training counts. *Dyer v. Pioneer Concepts*, 667 So.2d 961, 964 (Fla. 2d DCA 1996).

8

   c. Olsen implemented developments for asTech; and

   d. Olsen trained and coached others at AEST about asTech.

  26. Olsen's affidavit shows that before he came to AEST, he did have extensive training *generally* in fixing cars (Doc. 47-1, pages 2-4). But Olsen's affidavit shows that he had no *specialized* training or experience in remote diagnostics before he came to AEST (47-1, pages 2-4)—and he had none (McIntyre Declaration, para. 3). Rodriguez's affidavit says much the same (Doc. 47-12, paras. 8 and 11).

  27. Olsen and Rodriguez attempt to minimize their contact with Repairify's customers, but Olsen participated in developing the body shops as customers, and both Olsen and Rodriguez responded to and resolved customers' issues in diagnosing vehicles (Kelly Declaration, paras. 11-12; McIntyre Declaration, para. 4). And Repairify has and had substantial relationships with all of the customers because Repairify conducted active, on-going business with the customers, Repairify expects to continue that business, and Repairify's customers' contact information cannot easily be identified by Repairify's competitors (Kelly Declaration, paras. 11-12; and McIntyre Declaration, para. 6).

  28. Defendants argue that there was no mutual mistake regarding the definition of the Restricted Territory in their employment agreements (Doc. 47, pages 13-15), based on Olsen's and Rodriguez's affidavits (Docs. 47-1 and 47-12). Olsen and Rodriguez's arguments stretch the imagination—and are wrong (Doc. 41, page 2, n. 2; Doc 41-12; the Kristi Lamey affidavit, paras. 2-4); and the attached Kristi Lamey Declaration). Olsen and Rodriguez admit that in July 2015 they knew they were working for Repairify (Docs. 47-1, para. 37; and 47-12, para. 15)—before they signed their August 8, 2015 Repairify employment agreements.

29.     Lonnie Margol's affidavit says he is a member of Repairify and therefore can compete with Repairify (Doc. 47-16, para.27). But the Repairify agreement attached to his affidavit as Exhibit H shows that Margol is a beneficiary of a trust that owns an interest in Repairify—and trust beneficiaries are not members of Repairify (Doc. 47-24, pages 7, 8, 21, 27, 28 and 31 of 31).

30.     Defendants argue that if enjoined from working for AirPro, Olsen and Rodriguez "will be unable to continue to earn an income in their chosen professions" (Doc. 47, page 17). But Rodriguez says he works for an AirPro affiliate, which does not complete with Repairify, and only performs scans for AirPro "from time to time" (Doc. 47-12, paras. 39-41). Accordingly, Rodriguez would suffer de minimis damage if enjoined from working for AirPro. Based on their affidavits, Olsen and Rodriguez have substantial training and experience in many facets of the car collision/repair industry. Enjoining them from only working with a competitor that provides remote diagnostics would not inhibit them from obtaining gainful employment.

SMITH HULSEY & BUSEY


By   */s/ James A. Bolling*
       Michael E. Demont
       James A. Bolling

Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
jbolling@smithhulsey.com

Attorneys for plaintiff, Repairify, Inc.

**Certificate of Service**

I certify that on January 17, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.



*/s/ James A. Bolling*
Attorney

948796.2

## **Exhibits to Repairify's reply memorandum**

| Exhibit | Description |
|---|---|
| 1 | Printouts from the Division of Corporations regarding Nationwide Parts Distributors, Inc. and defendant AirPro Diagnostics, LLC |
| 2 | Lisa Brown's Declaration<br>    AEST Employee Handbook |
| 3 | Douglas Kelly's Declaration |
| A | AirPro's September 19, 2016 press release |
| B | Repairify's employee handbook |
| C | Honda's current repair instructions for a 2015 Accord |
| 4 | Walter McIntyre Declaration |
| 5 | Kristi Lamey's Declaration |